**UNITED STATES DISTRICT COURT**
**IN THE EASTERN DISTRICT OF MICHIGAN**

JESSICA BYERS, as the Personal
Representative for the Estate of
JACOB BYERS, Deceased

Case No.
Hon.

Plaintiff,

v.

Macomb County, OFFICER JESSICA PAPUGA, in her individual and official capacities as a Macomb County Police Officer, OFFICER HORAN, in his individual and official capacities as a Macomb County Police Officer, OFFICER SOUILLERE, in his individual and official capacities as a Macomb County Police Officer, WELLPATH CORRECTIONAL HEALTCARE, NURSE RENEE KNOCKEART,

Defendants.

---

**AYANNNA D. HATCHETT (P70055)**
**VEN R. JOHNSON (P3921**9)
VEN JOHNSON LAW, PLC
Hudson's Detroit
1240 Woodward Avenue, Suite 525
Detroit, MI 48226
(313) 324-8300
ahatchett@venjohnsonlaw.com

---

**COMPLAINT AND JURY DEMAND**

---

NOW COMES Plaintiff, JESSICA BYERS, as the Personal Representative of the ESTATE of JACOB BYERS, Deceased, by and through her counsel, Ven Johnson Law, PLC, to file this Complaint against the above-captioned Defendants and states the following:

## JURISDICTION & VENUE

1. In this civil action, Plaintiff Jessica Byers ("Plaintiff") seeks damages for the violations of Jacob Byers's ("Jacob") rights secured by the United States Constitution; the law of the United States, including but not limited to 42 U.S.C. § §1983 and 1988; as well as Michigan state law.

2. Jurisdiction of this court is found upon 28 U.S.C. § 1331, 1343(a)(4) and 42 U.S.C. § §1983 and 1988.

3. The events that give rise to this lawsuit took place in Macomb, Michigan, which is in the Eastern District of the State of Michigan.

4. Venue is appropriate in the Eastern District of Michigan pursuant to 8 U.S.C. § 1391 (b) because the County of Macomb is in the Eastern District of Michigan, the defendants are employees of the Macomb County Sheriff's Office, and he events that give rise to the lawsuit took place in Macomb, Michigan

5. The amount in controversy exceeds $75,000.00, exclusive of costs, interest, and attorney fees.

## PARTIES

6. Each of the above paragraphs are incorporated here.
7. Plaintiff, Jessica Byers, was at all times relevant to this cause of action a resident of the City of Madison Heights, County of Macomb, State of Michigan and a biological sibling of Jacob's.
8. Jessica Byers is the duly appointed Personal Representative of the Estate of Jacob Byers, deceased.
9. At all pertinent times, Defendant Macomb County ("Macomb") was a political subdivision of the State of Michigan and has a legal duty to enact and enforce policies, procedures,

protocols, and customs that conform with the Constitution and laws of the State of Michigan, as well as the United States.

10. At all pertinent times, Defendant Officer Abraham Sobh ("Sobh") was an employee of Defendant Macomb through the Macomb County Sheriff's Office and was acting under the color of law and in the course and scope of his employment.

11. At all pertinent times, Defendant Officer Jessica Papuga ("Papuga") was an employee of Defendant Macomb through the Macomb County Sheriff's Office and was acting under the color of law and in the course and scope of her employment.

12. At all pertinent times, Defendant Officer Horan ("Horan") was an employee of Defendant Macomb through the Macomb County Sheriff's Office and was acting under the color of law and in the course and scope of his employment.

13. At all pertinent times, Defendant Officer Soulliere ("Soulliere") was an employee of Defendant Macomb through the Macomb County Sheriff's Office and was acting under the color of law and in the course and scope of his employment.

14. At all pertinent times, Defendant Wellpath Correctional Healthcare ("Wellpath") was a contractor, contracted to work at the Macomb County Jail by Defendant Macomb County. Wellpath was working under the direction of Defendant Macomb.

15. At all pertinent times, Defendant Doctor Karina Purcell ("Purcell") was an employee of Wellpath Correctional Healthcare, a contractor employed by Defendant Macomb and was acting in the course of her employment.

16. At all pertinent times, Defendant Nurse Renee Knockeart ("Knockeart") was an employee of Wellpath Correctional Healthcare, a contractor employed by Defendant Macomb and was acting in the course of her employment.

## FACTUAL ALLEGATIONS

17. Each of the above paragraphs are incorporated here.

18. Jail video footage, and records were requested through the Freedom of Information Act (FOIA) and provided by Macomb County Jail.

19. This footage is pertinent to determining the actions of all the parties concerned, including Jacob's during the relevant period.

20. On December 26, 2023, at or about 10:20 p.m., Jacob was arrested by Roseville Police for alleged larceny in a building.

21. Jacob arrived at Macomb County Jail at approximately midnight on December 27, 2023.

22. Upon Jacob's arrival, he was searched by Officer Szep, placed in Holding Cell 1B, and given a brown bag of food along with one other detainee,

23. Jacob immediately sat down on the bench in Holding Cell 1B, opened the brown bag, and began eating from it.

24. Once Jacob finished eating, he stretched out on the bench and slept until the Officer's took him down to complete his booking at approximately 1:20 a.m.

25. Shortly after Jacob's booking was completed, he visited the nurse's room where according to the available video, a male nurse asked Jacob some questions, took his vitals, and weighed him.

26. The available video footage of Holding Cell 1B does not have audio.

27. From the nurse's room, Jacob was taken to Holding Cell 4 where he remained until he was removed by a guard at approximately 8:26 a.m.

28. From 1:38 a.m. to 8:26 a.m. video footage shows Jacob sleeping, talking, laughing with the other individuals in the cell, handing brown bags of food out to the other individuals in the cell, and eating his breakfast.

29. According to Defendant Wellpath's records a "Receiving Screening" was completed and signed by Jacob on December 27, 2023, at 3:30 a.m.

30. The available video footage of Holding Cell 4 shows Jacob sleeping on the floor at this time.

31. Dr. Purcell is listed as the Wellpath staff member that conducted the screening, which cannot be verified by video footage.

32. According to available court documents Jacob was scheduled to be arraigned via zoom on December 27, 2024, at 8:30 a.m. before Judge Kathleen Tocco.

33. Upon information and belief Jacob attended this hearing via zoom and was returned to his cell following the arraignment.

34. According to Defendant Officers Soulliere and Papuga's incident reports, they noticed Jacob shaking when they passed out lunch trays at approximately 11:12 a.m., and contacted Defendant Knockeart then to evaluate Jacob.

35. Officers Soulliere, Papuga, and Horan then went to Jacob's cell and "escorted" him down to the booking nurses office.

36. There is a significant gap in video footage that has not been provided from shortly after Jacob returns from court, to when Macomb Officers report that Jacob was seen shaking and drenched.

37. The missing video time is from approximately 9:36 a.m. to 11:13 a.m.

38. It is highly probable that in this hour and forty-five minutes Defendant Officers Papuga, Soulliere, and Officer Horan saw or should have seen Jacob exhibiting symptoms of a medical emergency.

39. Upon information and belief Macomb County Jail Officers are required to conduct checks every thirty minutes.

40. This means Defendant Officers should have conducted approximately three checks before they realized Jacob was exhibiting symptoms of a medical emergency.

41. Defendant Officer Soulliere stated in his report that he asked Jacob if he needed medical treatment, to which Jacob responded that he did not.

42. Defendants Soulliere and Papuga stated in their Incident Reports that after they spoke with Jacob they went into booking and contacted Defendant Knockeart to evaluate Jacob.

43. As Officer Soulliere approached the cell, accompanied with Papuga and Horan, to get Jacob he asked Jacob, "do you need a wheelchair?" Jacob responded, "no."

44. As Jacob moved to exit the cell he showed to be severely unstable. Relying on the cell door as an anchor and as his guide out of the cell.

45. Jacob was visibly shaking such that his answers to questions were unsteady.

46. Once Jacob reached the threshold of the cell door frame, Defendant Officer Soulliere grabbed, and held onto Jacob's arm and began supporting, and guiding him up the hallway.

47. Jacob stumbled backward almost falling but used his free arm to hold onto the wall.

48. Jacob continued down the hall with a staggering gait until Defendant Officer Horan joined Officer Soulliere escorting and supporting Jacob by holding onto his uniform shirt and guiding him toward the nurse's room.

49. As Defendant Horan moved to assist Defendant Officer Soulliere he asked Jacob, "what are you withdrawing from?" Jacob replied, "heroin."

50. Defendant Officers Horan and Soulliere continued escorting, supporting, and guiding Jacob to the bench outside of the nurse's room where they helped Jacob sit on the bench.

51. Defendant Soulliere assured Jacob that the nurse would be over shortly.

52. Defendant Officer Horan asked Jacob, "when was the last time that you used anything?" Jacob responded, "one week."

53. Defendant Soulliere then asked Jacob whether he was drenched from sweat or water from his sink.

54. Jacob explained that it was sweat and that he poured a cup of water on himself.

55. Nurse Knockeart arrived at 11: 16 a.m., Jacob, still struggling to stand, stumbled into the chair right next to Defendant Knockeart's station.

56. Defendant Knockeart asked Jacob if he had anxiety, to which Jacob responded, "yes…diagnosed." Knockeart then asked if this happens outside when his anxiety gets bad. Jacob responded, "no."

57. It should be noted that Defendant Knockeart was placed probation on November 4, 2023, for incompetence; Negligence-Impaired Conduct, Practice, or Condition.

58. When asked, Jacob reported his drug of choice is heroin and his last use was about one week ago.

59. Defendant Knockeart asked if Jacob takes prescription medication. Jacob reported he takes Vyvanse, Seroquel, and Prailar as prescribed by his doctor for the past two years. Jacob showed great difficulty speaking.

60. As Defendant Knockeart went to take Jacob's blood pressure she harshly instructed Jacob to put his arm down and stop tensing up.

61. Jacob apologized and did his best to put his arm down.

62. Defendant Knockeart continued asking Jacob questions about his drug use, then sternly told Jacob again, "I need you to sit still." Jacob responded that he was trying.

63. Defendant Knockeart told Jacob he needed to relax, and that she could see his muscles in his arm tensing.

64. Jacob is seen in the video trying to take deep breaths to relax. Unfortunately, he was unsuccessful at slowing his breathing.

65. Jacob reported that he drank a fifth of Jack Daniels every day, five days a week for the past two months. Jacob reported that his last drink was Christmas Eve, two days prior.

66. Defendant Knockeart again told Jacob that he needed to relax and that she would not be able to do anything until she was able to obtain his vitals.

67. As Knockeart again asked Jacob how long he had been drinking alcohol five times per week. Jacob said the last two the three months.

68. Defendant Knockeart then asked Jacob why he didn't tell "her" when he came in.

69. Jacob explained that he did not want to be in a cell by himself to detox.

70. Knockeart then explained to Jacob that he did not appear like he was detoxing, even though his shakes did seem like tremors.

71. As a registered nurse Knockeart knows that seizures are a known risk of alcohol withdrawal.

72. As a registered nurse Knockeart knows that seizures are a known risk of barbiturate withdrawal.

73. As a registered nurse Knockeart knows that seizures are a known risk of heroin withdrawal.

74. Nausea, dizziness, and sweating are known symptoms of oncoming seizures. Should know and steps needed to be taken to minimize effects of seizure and the potential for seizure.

75. Unable to obtain Jacob's blood pressure through the machine, Defendant Knockeart attempted to obtain Jacob's pressure manually.

76. Clearly upset with Jacob, Defendant Knockeart stated "That is not a tremor. You are tensing your arm. I need you to stop."

77. After finally getting Jacob's blood pressure, Defendant Knockeart asked Jacob how he was feeling aside from the shaking and his other symptoms

78. Jacob stated that he felt like he was going to throw up, like he had diarrhea, that he was hot and cold, and sweaty.

79. Jacob was with Defendant Knockeart for twelve minutes before, she then advised Defendant Soulliere to take Jacob to Medical nine or ten, because she would need to speak with the doctor.

80. Soulliere asked for the wheelchair to take Jacob down. Defendant Knockeart provided the wheelchair then asked if Jacob walked down to the nurse's room.

81. Officer Soulliere advised that Jacob had difficulty walking before and that he had fallen earlier.

82. The available video footage ends with Jacob being taken to medical and placed in cell 9 at approximately 11:29 a.m.

83. According to Defendant Sobh's Incident Report, at approximately 12:17 p.m., Nurse Knockeart informed Officer Sobh, who was assigned to the infirmary duty station that she needed to check on Jacob.

84. When Defendant Sobh went to check on Jacob, he observed him lying on the ground.

85. Defendant Sobh advised Defendant Knockeart that Jacob was on the ground and potentially seizing.

86. Defendants Knockeart and Officer Sobh entered the cell to check on Jacob.

87. Shortly after, the nurse practitioner entered the cell and instructed the officers to call an ambulance. Officer Sobh called the booking command center and requested an ambulance.

88. The available video footage resumes at 12:22 p.m., with ten nurses in the cell and in the medical hallway trying to get vitals on Jacob.

89. EMS arrived at 12:31 p.m., the nursing staff advised EMS that Jacob was probably "post-ictal." (Postictal is the period where a seizure subsides and the patient returns to baseline).

90. Jacob was transported to McLaren Hospital Macomb where additional treatment was provided.

91. Jacob arrived at the emergency department at approximately 1:03 p.m., unresponsive, with no pulse. The emergency staff was eventually able to intubate and sedate Jacob.

92. Jacob remained incapacitated until his death on December 24, 2024. Jacob died due to chronic hypoxic respiratory failure, pneumonia, and anoxic brain injury.

**COUNT I – DELIBERATE INDIFFERENCE VIOLATION OF CONSTITUTIONAL RIGHTS UNDER THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION PURSUANT TO 42 U.S.C. § 1983 –OFFICER JESSICA PAPUGA, OFFICER HORAN, OFFICER SOULLIERE, and NURSE RENEE KNOCKEART**

93. Each of the above paragraphs are incorporated here.

94. Defendants Soulliere, Papuga, Horan, and Knockeart, were at all times relevant to this cause of action within the scope of their employment and acting under the color of state law.

95. Jacob at all times relevant to this cause of action was afforded the constitutional rights under the Fourteenth Amendment to the United States Constitution to adequate and sufficient medical care and/or treatment such that his life would be preserved and he at all times would be free from needless unjustified and preventable pain, suffering, and deterioration of his health and ultimately death.

96. Jacob, while in the custody of Macomb County Jail, suffered from a serious medical condition for which he had sufficiently serious medical needs and from which he faced a substantial risk of serious harm.

97. Defendants Soulliere, Papuga, Horan, and Knockeart knew facts that obviously signaled the need medical attention or from which an inference could be drawn that Jacob faced a substantial risk of serious harm due to his serious medical needs and did in fact draw that inference.

98. Dr. Karina Purcell claimed to have conducted Jacob's Receiving Screening, although this is contradicted by the available video footage which shows Jacob sleeping at the time.

99. By falsely claiming she assessed Jacob, Purcell mislead the nursing staff and jailers into believing Jacob did not require further or additional assessment or observation. Which ultimately resulted in his symptoms worsening.

100. Defendants Papuga, Horan, and Soulliere were responsible for monitoring the holding cells, including holding cell four where Jacob was housed.

101. While Defendants Horan, Papuga and Soulliere eventually noticed that Jacob was experiencing a medical emergency it is highly probable that they should have observed this emergency before 11:13 a.m., when they passed out lunch trays.

102. The video footage provided through separate FOIA requests is missing a significant portion of time (approximately one hour and forty-five minutes).

103. This missing period of footage is the period of time directly before Defendants Horan, Papuga, and Soulliere observed Jacob shaking and sweating excessively.

104. In this approximate one hour and forty-five minutes Defendant Officers Papuga, Soulliere, and Horan would have conducted rounds every thirty minutes. This means they would have checked approximately three times.

105. Defendants Papuga, Horan, and Soulliere failed to respond to Jacob's obvious symptoms of a medical emergency despite their routine rounds, if they were conducted.

106. Had Defendants Papuga, Horan, and Soulliere gotten Jacob down to the nurse earlier his symptoms could have been addressed and his seizure prevented.

107. Defendant Knockeart evaluated Jacob and identified his shaking as tremors and observed his excessive sweating.

108. Defendant Knockeart was aware of Jacob's prescription medication, drug use, and alcohol use, all of which combined with the symptoms he exhibited should have lead her to believe a seizure was oncoming. [1]

109. Defendant Knockeart inappropriately and intentionally minimized Jacob's symptoms.

---

[1] Withdrawal from significant amounts of alcohol can lead to seizures. https://freebythesea.com/can-alcohol-withdrawal-cause-seizures/. Withdrawal from prescription medications such as Vyvanse, and Seroquel can lead to seizures. https://www.alternativetomeds.com/blog/seroquel-withdrawal/.

110. Evidence demonstrates that this is not the first time that Defendant Knockeart acted in a way that negatively impacted a patient. In this case her conduct resulted in the worsening of Jacob's symptoms and his ultimate death.

111. With great resistance, Defendant Knockeart eventually determined that Jacob needed to be placed in a medical cell and that the doctor needed to be consulted.

112. Defendant Knockeart knew that Jacob was experiencing a serious medical emergency and should have reached out to the doctor and or arranged for Jacob to be transported to the hospital.

113. Had Defendant Knockeart promptly reached out to Dr. Purcell about Jacob's condition and the need for Jacob to receive outside medical attention Jacob could have survived.

114. The specific policies and procedures of Macomb and those of any reasonable detention or medical personnel required that its personnel make a reasonable effort to determine whether a detainee is intoxicated or suffered from commonplace opiate withdrawal or may suffer a serious medical emergency.

115. The specific policies and procedures of Macomb and those of any reasonable detention or medical personnel required that its personnel, once they become aware that a person is or was recently under the influence of alcohol or in the midst of opiate withdrawal, be aware that that detainee presents an increased risk for a serious medical emergency including death, and that there is a need to be alert for indicators that a detainee may be at risk of suffering a serious medical emergency because of their state.

116. Defendants Soulliere, Papuga, Horan, Purcell, and Knockeart knew or should have known that Jacob faced a substantial risk of serious harm because he was shaking uncontrollably

sweating excessively, admitted to drinking a fifth of Jack Daniels daily for the past two to three months, admitted to taking heroin as recently as a week prior to his arrest.

117. Despite these obviously unusual and concerning symptoms, they did not facilitate Jacob's prompt and immediate transport to the hospital.

118. The actions and/or inactions of Defendants Soulliere, Papuga, Horan, Purcell, and Knockeart as described above, constitute deliberate indifference to Jacob's serious medical needs in violation of his rights.

119. The right to be free from deliberate indifference to serious medical needs was at all times relevant to this cause of action and clearly established such that a reasonable official in Sobh's, Szep's, or Wolak's respective positions would have known and understood that their actions/ or inactions as described above violated Jacob's constitutional rights.

120. Defendants Soulliere, Papuga, and Horan are not entitled to qualified immunity.

121. As a direct and proximate result of the deliberate indifference as described above, Jacob suffered damages, both economic and non-economic, severe physical, psychological, emotional injuries, and ultimately death, and those damages include, but are not limited to the following:

a. Physical pain and suffering;

b. Mental anguish

c. Fright and shock;

d. Denial of social pleasure and enjoyments;

e. Embarrassment, humiliation, and mortification;

f. Reasonable expenses of necessary medical care, treatment and services;

g. Loss of earnings;

h. Loss of earnings capacity;

i. Any and all injuries or damages that are learned through the course of discovery.

122. Pursuant to 42 U.S.C. §§ 1983 and 1988, Defendants are liable to Plaintiff for all damages allowed under federal law. To the extent that the damages allowable and/or recoverable under one or both of the statutes are deemed insufficient to fully compensate Plaintiff and/or to punish or deter Defendants, this Court should order and award additional damages to be allowed so as to satisfy any and all such inadequacies

123. The actions of Soulliere, Papuga, and Horan as described above were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm of Jacob. As a result of such intentional conduct, Plaintiff is entitled to punitive damages in an amount sufficient to punish Defendant Officers and to deter others from like conduct.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgement in favor and against Defendants, in an amount in excess of $75,000.00, plus costs, interest, and attorney fees, as well as punitive and/or exemplary damages so wrongfully incurred, as the Court deems just.

**COUNT II – MUNICIPAL/ SUPERVISORY LIABILITY PURSUANT TO 42 U.S.C. §1983 – DEFENDANT MACOMB COUNTY, DEFENDANT WELLPATH**

124. Each of the above paragraphs are incorporated here.

125. Pursuant to 42 U.S.C. § 1983, as well as the Eighth and Fourteenth Amendments to the United States Constitution, Defendant Macomb owed Jacob certain duties to properly hire, supervise, monitor, and train its employees and officers so as not violate the constitutional rights of individuals, and Jacob in particular and as alleged throughout this Complaint, and

to take proper measures to report, prevent, or otherwise protect individuals such as Jacob in the event that such violations occur.

126. Defendant Macomb is liable pursuant to 42 U.S.C. § 1983, in that its policies, procedures, regulations, and customs, or that its failure to enact policies, procedures, regulations, and customs, such that those policies, procedures, regulations, and customs caused and were the driving force behind the violation of Jacob's constitutional rights as alleged throughout this Complaint.

127. Defendants Macomb and Wellpath were deliberately indifferent to Jacob's constitutional and other rights by failing to promulgate a policy and failing to properly train its personnel and employees to prevent the violation of individuals' constitutional rights, and in particular to provide or facilitate prompt and immediate medical attention to Jacob and/or transport him to a hospital in response to a known risk of serious harm due to serious medical needs.

128. Defendant Macomb and Wellpath were deliberately indifferent to Jacob's constitutional and other rights by failing to train and supervise its personnel and employees on the constitutional rights of detainees.

129. Defendant Macomb failed to properly train its personnel—Soullier, Papuga, and Horan—regarding those procedures and such failure was the driving force behind the violation of Jacob's rights.

130. Defendant Macomb failed to properly train its personnel on the symptoms of withdrawal and how to handle or respond to a detainee exhibiting those symptoms.

131. Defendant Macomb failed to enact a specific policy or procedure for its personnel on how to respond to detainees suffering from or experiencing a serious medical condition or emergency.

132. Defendant Macomb failed to properly train its personnel regarding the policies and procedures to be followed when handling detainees with a serious medical condition or emergency.

133. Had Defendant Macomb properly trained and supervised its personnel and agents regarding those policies and procedures, the individual Defendants would have responded to secure the required medical care for Jacob to which he was entitled to under the Fourteenth Amendment to United States constitution and he would not have incurred the significant damages outlined within this complaint.

134. Defendant Macomb, through its policies, procedures, regulations, or customs, or lack thereof, breached its duties, which amounted to reckless and/or deliberate indifference toward the general public, and toward Jacob specifically, in the following ways including but not limited to:

a. Failing to properly train its personnel regarding responding to and providing medical care in response to a known serious medical need for prisoners and/or detainees;
b. Employing and retaining improperly trained employees;
c. Failing to enact or provide training on proper policies in regard to responding to and providing medical care in response to a known serious medical need of prisoners and/or detainees;
d. Failing to enact or provide training on proper policies;
e. Failing to have proper policies, procedures, and training regarding responding to and providing medical care in response to a known serious medical need or prisoners and/or detainees;
f. Failure to hire and/or retain personnel whose character and personality would not pose a potential violation of individuals' constitutional rights;
g. Failure to adequately monitor the conduct and behavior of its personnel;

h. Sanctioning the conduct as alleged throughout this Complaint by failing to adequately discipline or terminate personnel who are known to have engaged in such conduct;
i. Having a custom, policy, or practice of tolerating the violation of constitutional rights by employees:
j. Ratifying the violation of constitutional rights by personnel;
k. Other acts and omissions which may be learned through the course of discovery.

135. Defendant Wellpath failed to properly hire and train its staff. Defendant Knockeart had been placed on probation on November 4, 2023, by the Bureau of Professional Licensing ("BPL") Disciplinary Code.

136. According to LARA's BPL Public Health Disciplinary Code, Defendant Knockeart was "incompetent, and engaged in negligence- impaired conduct, practice, or condition." This was just sixty-three days before her interaction with Jacob.

137. Defendant Wellpath knew or should have known that Defendant Knockeart was on probation and required additional supervision.

138. Despite this knowledge Defendant Wellpath allowed Defendant Knockeart to work independently with limited to no supervision.

139. If Defendant Knockeart had been properly supervised Jacob's medical emergency would have been appropriately assessed and handled.

140. Defendant Wellpath failed to enact policies and procedures for its staff to follow to ensure an accurate medical record is obtained from detainees for proper treatment.

141. Defendant Wellpath failed to train its staff to identify symptoms and or signals of a serious medical condition.

142. Had Defendant Wellpath properly trained and supervised its staff regarding those policies and procedures, the individual Defendant Knockeart would have made sure Jacob visited

with the doctor and/or was transported out of the facility for appropriate medical care earlier.

143. As a direct and proximate result of the deliberate indifference as described above, Jacob suffered damages, both economic and non-economic, severe physical, psychological, emotional injuries, and ultimately death, those damages include, but are not limited to the following:

a. Physical pain and suffering;
b. Mental anguish
c. Fright and shock;
d. Denial of social pleasure and enjoyments;
e. Embarrassment, humiliation, and mortification;
f. Reasonable expenses of necessary medical care, treatment and services;
g. Loss of earnings;
h. Loss of earnings capacity;
i. Any and all injuries or damages that are learned through the course of discovery.

144. Pursuant to 42 U.S.C. §§ 1983 and 1988, Defendants are liable to Plaintiff for all damages allowed under federal law. To the extent that the damages allowable and/or recoverable under one or both of the statutes are deemed insufficient to fully compensate Plaintiff and/or to punish or deter Defendants, this Court should order and award additional damages to be allowed so as to satisfy any and all such inadequacies.

145. The actions of Defendant Macomb County Jail as described above were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm to Jacob. As a result of such intentional conduct, Plaintiff is entitled to punitive damages in an amount sufficient to punish Defendant Macomb County Jail and to deter others from like conduct.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgement in favor and against Defendants, in an amount in excess of $75,000.00, plus costs, interest, and

attorney fees, as well as punitive and/or exemplary damages so wrongfully incurred, as the Court deems just.

Respectfully submitted,

**VEN JOHNSON LAW, PLC**

*/s/ Ayanna D. Hatchett*
AYANNA D. HATCHETT (P70055)
VEN R. JOHNSON (P39219)
Attorneys for Plaintiff
Hudson's Detroit
1240 Woodward Ave, Suite 525
Detroit, Michigan 48226
(313) 324.8300
ahatchett@venjohnsonlaw.com

Dated: November 3, 2026

**UNITED STATES DISTRICT COURT**
**IN THE EASTERN DISTRICT OF MICHIGAN**

JESSICA BYERS, as the Personal
Representative for the Estate of
JACOB BYERS (decedent),

Case No.
Hon.

Plaintiff,

v.

Macomb County, OFFICER JESSICA PAPUGA,
in her individual and official capacities as a Macomb
County Police Officer, OFFICER HORAN, in his individual
and official capacities as a Macomb County Police Officer,
OFFICER SOUILLERE, in his individual
and official capacities as a Macomb County Police Officer,
WELLPATH CORRECTIONAL HEALTCARE,
NURSE RENEE KNOCKEART,

Defendants.

---

**AYANNNA D. HATCHETT (P70055)**
**VEN R. JOHNSON (P3921**9)
VEN JOHNSON LAW, PLC
Hudson's Detroit
1240 Woodward Avenue, Suite 525
Detroit, MI 48226
(313) 324-8300
ahatchett@venjohnsonlaw.com

---

**JURY DEMAND**

Plaintiff respectfully demands a trial by jury pursuant to Fed. R. Civ. P. 38(b).

**VEN JOHNSON LAW, PLC**

*/s/ Ayanna D. Hatchett*
AYANNA D. HATCHETT (P70055)
VEN R. JOHNSON (P39219)
Attorneys for Plaintiff
Hudson's Detroit
1240 Woodward Ave, Suite 525
Detroit, Michigan 48226
(313) 324.8300
ahatchett@venjohnsonlaw.com

Dated: November 3, 2026